## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **Philip B. Inman**, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>THE TAP BTOWN, INC., and **Nathan Finney**,<br><br>    Defendants. | COLLECTIVE ACTION COMPLAINT PURSUANT TO 29 U.S.C. § 216(B)<br><br>Cause No. 1:22-cv-01639-SEB-MG |

## PLAINTIFF'S UNOPPOSED MOTION FOR APPROVAL OF FLSA COLLECTIVE ACTION & SETTLEMENT AGREEMENT

Named/Representative Plaintiff Philip B. Inman ("Inman"), on behalf of himself and others similarly situated (collectively "COLLECTIVE" or "Plaintiffs"), by and through counsel ("COLLECTIVE COUNSEL"), respectfully submits this motion/supporting memorandum in support of *Plaintiff's Unopposed Motion for Approval of FLSA Collective Action & Settlement Agreement*.

Respectfully submitted,

/s/ Benjamin C. Ellis

Benjamin C. Ellis
HKM EMPLOYMENT ATTORNEYS LLP
320 N. Meridian St., Ste. 615
Indianapolis, IN 46204
P/F   | (317) 824-9747
Email  | bellis@hkm.com

/s/Robert P. Kondras, Jr. (w/ permission)

Robert P. Kondras, Jr.
HASSLER KONDRAS MILLER LLP
100 Cherry St.
Terre Haute, IN 47807
Phone  | (812) 232-9691
Fax    | (812) 234-2881
Email  | kondraw@hkmlawfirm.com

## I.    INTRODUCTION

On November 7, 2022, Named Plaintiff Inman, on behalf of the COLLECTIVE, and Defendants THE TAP BTOWN, INC. Inc. and Nathan Finney (collectively "THE TAP" or "Defendants") (together the "PARTIES," and individually a "PARTY"), by and through counsel, participated in a full day of private mediation and reached an agreement, subject to Court approval, to resolve this FAIR LABOR STANDARDS ACT ("FLSA") wage and hour collective action on a collective-wide basis for significant monetary relief.  The settlement followed a thorough investigation by COLLECTIVE COUNSEL and a significant production of wage data and data of hours worked by Servers, and exchange of Plaintiff's mediation statement in advance of mediation.

On June 9, 2023, the Court conditionally certified this lawsuit as a collective action under the FLSA [Dkt. 46.]. 29 USC § 216(b). The Court permitted notice of this FLSA collective action to be mailed to 162 potential opt-in plaintiffs. 52 timely returned their opt-in Consent Forms by the September 5, 2023, deadline. (Ex. 2, Ellis Decl. ¶ 15); (Ex. 3, Kondras Aff. ¶ 13). Consistent with the terms of the settlement agreement, $251,005.23 – or 65.8% of the maximum – will be paid out to opt-ins at the higher agreed-upon rate of $9.71 per hour worked. (Ex. 2, Ellis Decl. ¶ 16); (Ex. 3, Kondras Aff. ¶ 14.) Additionally, the NET FUND shall pay class administration fees to ANALYTICS CONSULTING, which

are estimated to be $8,857.00. (Ex. 2, Ellis Decl. ¶ 17); (Ex. 3, Kondras Aff. ¶ 16.)

Pursuant to the parties' *Settlement Agreement and Release* ("SETTLEMENT AGREEMENT"), see (Ex. 1), Plaintiff's attorneys' fees shall be paid in the sum of $190,288.81. *See also* (Ex. 2, Ellis Decl. ¶ 13); (Ex. 3, Kondras Aff.  ¶ 15.)  The attorneys' out-of-pocket expenses shall be paid from this sum (approximately $5,000.00, most of which was the cost of mediation). After all expenses are reimbursed, the COLLECTIVE COUNSEL shall evenly split the net attorneys' fees between their two law firms.

Inman now seeks the Court's final approval of the SETTLEMENT AGREEMENT, final certification of the FLSA collective action as part of the settlement, approval of the agreed-upon attorneys' fees and costs, and an Order dismissing this action and granting the release provided in the SETTLEMENT AGREEMENT. As part of that Order, the Court will approve the mailing of settlement checks to all Plaintiffs and their counsel pursuant to the terms of the SETTLEMENT AGREEMENT.

The SETTLEMENT AGREEMENT satisfies the criteria for approval of an FLSA settlement agreement because: (**1**) it represents a fair and reasonable compromise of a *bona fide* dispute between the Parties; (**2**) it was reached through arm's length negotiations undertaken between counsel for Plaintiffs and Defendants, and with the assistance of a well-known and experienced neutral mediator; and (**3**) the value of the

recovery outweighs the mere possibility of further relief after protracted and expensive litigation.

Accordingly, Plaintiffs request that the Court issue an Order: (**1**) approving the $572,000 maximum gross settlement fund set forth in the SETTLEMENT AGREEMENT; (**2**) issuing final certification of this lawsuit as a collective action pursuant to the FLSA for settlement purposes; (**3**) approving COLLECTIVE COUNSEL's requests for attorneys' fees, costs, and expenses incurred in the litigation; (**4**) permitting **analytics consulting**, the settlement administrator, to distribute funds to Plaintiffs and their counsel pursuant to the terms of the parties' SETTLEMENT AGREEMENT; and (**5**) entering a final judgment dismissing this action with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations Supporting the Collective Claims

On August 18, 2022, Plaintiff Inman, a Server at THE TAP, filed an FLSA wage and hour claim, alleging he would seek its certification as a collective action. [Dkt. 1]. Inman alleged that he and other similarly-situated, non-exempt, hourly paid Servers at THE TAP had been unlawful deprived of their minimum wage due to unlawful tip pooling and tip credit practices. Inman claimed that he and other Server employees were owed a full minimum wage and return of certain tips contributed to the tip pool. The complaint sought unpaid minimum wages, unpaid overtime, liquidated damages and reasonable attorneys'

fees, costs, and expenses on behalf of Inman and other similarly situated employees.

### B. Overview of Investigation, Litigation, and Settlement Negotiations

COLLECTIVE COUNSEL conducted a thorough investigation into the merits of the potential claims and defenses before filing this lawsuit. As part of that investigation, counsel interviewed Inman, some of the voluntary opt-in plaintiffs (directly and indirectly) and assessed Inman's claims and the potential defenses. Principal in this investigation, the PARTIES sought to determine the date THE TAP changed its tip pooling rules and practices in a way that came into compliance with the FLSA. The PARTIES determined the most likely date the tip pool would be deemed compliant was June 5, 2022.

After the *Complaint* was filed, the PARTIES agreed to an early mediation before any contested motions regarding collective certification were filed. The PARTIES further agreed to THE TAP's production of class-wide wage and hour data necessary to calculate tip credit and tip pooling damages. The PARTIES' counsel entered into an agreement that provided for mediation before Lynn Cohn, in addition to being a professor at NORTHWESTERN PRITZKER SCHOOL OF LAW, she is an experienced and well-respected complex action mediator.  (Ex. 2, Ellis Decl. ¶ 19); (Ex. 3, Kondras Aff. ¶ 17.)

The case was scheduled for ZOOM mediation on November 7, 2022. Several weeks before the mediation, THE TAP produced collective-wide data as to Servers' wages and hours-worked, as well as cumulative class-wide data for all potential collective members. In advance of the mediation, Inman provided THE TAP with a redacted version of his mediation statement; this included his demand and calculations of damages at 4 different points in time. During the mediation itself, the PARTIES exchanged several offers before reaching an agreement, which was memorialized in a signed *Settlement Term Sheet* that was finalized on November 29, 2022. The terms of that signed *Settlement Term Sheet* served as the basis for the formal Settlement Agreement submitted to the Court herein.

### C.    Settlement Terms

Among other things, the SETTLEMENT AGREEMENT required THE TAP to establish a maximum gross settlement fund of $572,000.00 for the benefit of all PUTATIVE SETTLEMENT PLAINTIFFS, defined in the SETTLEMENT AGREEMENT as follows:

- To Settlement Plaintiffs (who are the Named Plaintiff, and those Putative Settlement Plaintiffs who submit timely, fully and properly completed Opt-In forms signifying their agreement to release wage and hour claims against The Tap as more fully set forth in the Settlement Agreement), shares of the Net Settlement Fund pursuant to an agreed upon allocation formula hours worked within the dates set forth in the Settlement Agreement. Each Putative Settlement Plaintiff's portion of the Net Fund will be calculated by multiplying the hours worked in the relevant

6

period by an hourly payment of no less than $7.59 per hour, and no more than $9.71 per hour, as determined by the number of opt ins and available Net Fund. Plaintiff's portion of the Net Fund will be $40,000. Any unclaimed funds will revert to The Tap, and any Putative Settlement Plaintiff who does not wish to participate will not release any claims and will not be bound by the Settlement Agreement.

- To Collective Counsel, as described more fully below, one-third of the maximum gross settlement fund for attorneys' fees and costs, including court costs (upon Court approval), and including those in connection with securing this Settlement, the claims process, and implementing this Settlement Agreement.

- To the Settlement Administrator, as described more fully below, for the expenses incurred by it in administering the Settlement including, but not limited to, providing notice to the Putative Settlement Plaintiffs, calculating and disbursing settlement proceeds, processing claims, performing all tax reporting obligations, and establishing a Qualified Settlement Fund.

*See generally* (Ex. 1.) *See also* (Ex. 2, Ellis Decl. ¶ 14); (Ex. 3, Kondras Aff. ¶ 12.)

### D.    Wage and Hour Claims Release

Each potential collective member who chooses to opt into this FLSA settlement will be bound by a release of all wage and hour-related claims through the date of the Court's approval order. In addition, each collective member agrees not to accept, recover, or receive any backpay or other relief based on any released claims that may arise out of, or in connection with any other individual, union representative, class or any administrative or arbitral remedies pursued by any individual, class/collective, union or federal, state or local governmental agency against the released parties. (Ex. 1 at 9.)

### E.    Settlement Administration

The Court appointed the parties' agreed-upon settlement administrator, ANALYTICS CONSULTING of Chanhassen, Minnesota. ANALYTICS CONSULTING will mail settlement checks to Inman, each participating plaintiff, and COLLECTIVE COUNSEL pursuant to the terms of the SETTLEMENT AGREEMENT.

This appointment is efficient because ANALYTICS CONSULTING has served as class administrator in many of COLLECTIVE COUNSEL's prior wage and hour class and collective actions. ANALYTICS CONSULTING has proven to be reliable and efficient, with reasonable rates that benefit the COLLECTIVE. COLLECTIVE COUNSEL will provide such information for Inman and those who filed consents outside of the Court-authorized notice process.

Defendants have already provided the necessary information for distribution. This includes the hours worked between August 18, 2019, and June 5, 2022, for all potential members of the COLLECTIVE, permitting the calculation of each individual's period of eligibility and associated amounts. The Court should approve the $8,857.00 class administration fee to be paid to Analytics Consulting from the NET FUND.

F.      **Attorneys' Fees, Costs, and Expenses**

COLLECTIVE COUNSEL requests the Court to approve the PARTIES' agreed-upon attorneys' fee award in the amount of $190,288.81. (Ex. 1 at 4.) This amount equals one-third of the gross maximum settlement fund. (Ex. 1 at 4.); (Ex. 2, Ellis Decl. ¶ 17); (Ex. 3, Kondras Aff. ¶ 15.) THE TAP does not oppose this request. These fees will be used to reimburse COLLECTIVE COUNSEL for the expenses advanced on behalf of the COLLECTIVE, with the net remaining amount evenly divided between HASSLER KONDRAS MILLER LLP and HKM EMPLOYMENT ATTORNEYS LLP. (Ex. 2, Ellis Decl. ¶ 17); (Ex. 3, Kondras Aff. ¶ 15.)

III.   **ARGUMENT**

A.     **The Court should issue final certification of the proposed Collective.**

Because Inman has shown that the proposed collective members are similarly situated, the Court should issue final certification of the COLLECTIVE. *See Gallant v. Arrow Consultation Servs.*, Inc., 2020 WL 2113399, at *1 (S.D. Ind. May 4, 2020) (Barker, J.) ("Where the parties reach settlement after a court has conditionally certified a collective class, the court still must make some final class certification before approving a collective action settlement.") (quoting *Burkholder v. City of Fort Wayne*, 750 F.Supp.2d 990, 993 (N.D. Ind. 2010) (collecting cases) (internal quotations omitted)). Based on Inman's evidence that the putative COLLECTIVE members were subject to the same tip credit and tip pooling practices and procedures that deprived them of their

minimum wages between August 18, 2019, through June 5, 2022, see [Dkt. 43 at 42-3], the Court issued a conditionally certified the COLLECTIVE on June 9, 2023. [Dkt. 46 at 1].

As a result of the PARTIES' overall settlement and joint stipulation to FLSA certification, the certified collective was limited to the 162 Servers who worked at The Tap at its location in Bloomington, Indiana. *See* (Ex. 1 at 6) ("The parties have determined that up to 162 Notices shall be mailed."). Those servers were subject to THE TAP's tip credit and tip pooling practices during that time period and were paid hourly at a $2.13 per hour tip credit rate. [Dkt. 43-3 ¶¶ 5-9] (Inman's Declaration); [Dkt. 43-4 ¶¶ 3-6] (Riggert's Declaration). For the purposes of this settlement only, Inman and the Servers included in the conditionally certified COLLECTIVE are alleged "victims of a common policy or plan." *Gallant*, 2020 WL 2113399, at *1 (finding final certification of collective appropriate) (citations omitted).  Thus, for purposes of the proposed settlement, they Court should find them to be similarly situated within the meaning of Section 16(b) of the FLSA, 29 U.S.C. 216(b).

**B.    The Court should approve the Parties' arms-length Settlement Agreement as fair and reasonable.**

**1.    The Settlement is a Fair and Reasonable Compromise of a *Bona Fide* Dispute**

The Court should the PARTIES' SETTLEMENT AGREEMENT because: (**1**) it is the result of the arms-length negotiation of a *bona fide* dispute between represented parties, (**2**) continued litigation would risk a loss for the potential COLLECTIVE members, and (**3**) the terms of the SETTLEMENT AGREEMENT are fair and reasonable.

To effectuate a binding release, private FLSA settlements generally require judicial approval. *See, e.g., Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1354 (11th Cir. 1982); *Gallant*, 2020 WL 2113399, at *2; *Campbell v. Advantage Sales & Mktg. LLC*, 2012 WL 1424417, at *1 (S.D. Ind. Apr. 24, 2012) (McKinney, J.) (citing 29 U.S.C. § 216(b) and *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986)). "'A one-step approval process is appropriate' in FLSA collective actions." *Gallant*, 2020 WL 2113399, at *2 (quoting *Knox v. Jones Grp.*, 15-cv-1738, SEB-TAB, 2017 WL 3834929, at *2 (S.D. Ind. Aug. 31, 2017) (Baker, MJ) (collecting cases). "In other words, the Court can review and approve the settlement agreement without holding a final fairness hearing or adhering to the other requirements contained in Rule 23 of the Federal Rules of Civil Procedure. This is due to the fundamental differences between 'opt-in' and 'opt-out' class actions governed by Rule 23." *Gallant*, 2020 WL 2113399, at *2 (quoting *Heuberger v. Smith*, No. 3:16-CV-386 JD,

2019 WL 3030312, at *2 (N.D. Ind. Jan. 4, 2019)) (internal quotation citations omitted).

Under the FLSA, "the failure to opt in [ ] does not prevent potential members of the collective from bringing their own suits in the future." *Knox*, 2017 WL 3834929, at *2 (citing *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982)). Because they are not foreclosing the rights of absent persons, courts do not apply the more stringent Rule 23 standards to FLSA settlements. *See, e.g.*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013). There is no need to require that the settlement provide for opt-outs or objections where individuals are not part of the settlement unless they decide to participate in it. *See Prena v. BMO Fin. Corp.*, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015); *Woods*, 686 F.2d at 580 ("The difference between a Rule 23 class action and a section 16(b) class action is . . . that in the latter the class member must opt in to be bound, while in the former he must opt out not to be bound.").

Under the FLSA, "[n]ormally, a settlement is approved where it is the result of 'contentious arm's length negotiations, which were undertaken by counsel . . . and serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation." *Gallant*, 2020 WL 2113399, at *2 (quoting *Campbell*, 2012 WL 1424417, at *2) (citations omitted). "Courts are required to determine the fairness of a

12

collective action settlement by assessing 'whether the agreement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Gallant*, 2020 WL 2113399, at *2 (quoting *Burkholder*, 750 F. Supp. 2d at 995); *see also Knox*, 2017 WL 3834929, at *2 ("A district court should approve an FLSA collective action if it was reached as a result of contested litigation and it is a fair and reasonable resolution of a bona fide dispute between the parties.") (citations omitted). Moreover, "[i]t is a well settled principle that the law generally encourages settlements." (quoting *Dawson v. Pastrick*, 600 F.2d 70, 75 (7th Cir. 1979)).

The SETTLEMENT AGREEMENT meets these standards and should be approved. First, the PARTIES' settlement was the result of extensive pre-suit investigation by COLLECTIVE COUNSEL; negotiation of a complete settlement that includes stipulation to conditional certification; voluntary informal discovery related to liability and damages; and private mediation with an experienced complex action mediator. COLLECTIVE COUNSEL investigated the tip pool and tip credit practices of THE TAP and obtained consents to join the litigation from 15 voluntary opt-in plaintiffs prior to the Court's conditional certification. The PARTIES ultimately agreed, after extensive discussion, to engage in early mediation; this allowed the PARTIES and the Court to avoid extensive and costly discovery and motions practice.

On November 7, 2022, the PARTIES negotiated an arms-length settlement with the assistance of Professor Lynn Cohn, a well-known and respected mediator who specializes in the resolution of complex civil litigation. (Ex. 2, Ellis Decl. ¶ 19); (Ex. 3, Kondras Aff. ¶ 17.) Recognizing the uncertain legal and factual issues involved, the PARTIES reached an agreement on the essential terms of a proposed settlement at mediation and thereafter exchanged drafts of the proposed settlement agreement. "In such circumstances, district courts typically have no trouble concluding that a settlement agreement was the result of 'contentious arms-length negotiations.'" *Chen v. Genesco, Inc.*, 2020 WL 360517, at *4 (S.D. Ind. Jan. 22, 2020) (Barker, J.) (finding this standard met where agreement was met following a comprehensive pre-suit investigation, private mediation and related discovery, contested motions, and extensive settlement discussions).

Second, continued litigation would involve significant risks for the potential COLLECTIVE members. By way of example, the COLLECTIVE could have been decertified. Plaintiffs also risk losing the merits at summary judgment or at trial or receiving a smaller damages award. A significant dispute exists between the PARTIES as to the period of THE TAP's noncompliance with the FLSA; this includes THE TAP's position that it became compliant in 2022, when it disallowed security personnel from sharing in the tip pool. In addition, the PARTIES agree that a trial on the merits would be expensive and time-consuming for all

14

involved. *See Chen*, 2020 WL 360517, at *4 (approving FLSA settlement in light of risks to plaintiffs at trial on liability and damages because, "[i]n light of those risks, agreeing to a settlement 'is not indicative of overreaching by the employer or waiver of rights by the employees, but of a reasoned and counseled decision by both sides'") (quoting *Heuberger*, 2019 WL 3030312, at *3)).

Third, the proposed allocation of the settlement is fair and reasonable. The PARTIES have agreed on an allocation formula that considers the number of hours worked by each potential COLLECTIVE member during their relevant limitations period. *See Chen*, 2020 WL 360517, at *4; *Summers v. UAL Corp. ESOP Comm.*, 2005 WL 3159450, at *2 (N.D. Ill. Nov. 22, 2005) (approving allocation plan as reasonable when "settlement funds . . . will be disbursed on a pro rata basis"); *Hens v. Clientlogic Operating Corp.*, 2010 WL 5490833, at *2 (W.D.N.Y. Dec. 21, 2010) (allocation formula based on plaintiffs' length of service was "equitable and reasonable"). In this case, for every hour worked and paid at $2.13 per hour by a Server, the Server will recover more than the $5.12 per hour necessary to bring the wage to a full minimum wage of $7.25. Based upon additional damages theories alleged by Plaintiff, each Server will actually receive at least $7.59 for every hour worked and, depending upon how many opt into the collective action, could receive as much as $9.71 for every hour worked. For some plaintiffs who have opted in, this will allow them to be compensated for more than 1,000 hours worked.

15

After the Court certified the FLSA collective action, a significant number of additional opt-in Plaintiffs joined the action. As of this filing, 52 plaintiffs have claimed their funds made available by the settlement agreement. (Ex. 2, Ellis Decl. ¶ 15); (Ex. 3, Kondras Aff. ¶ 13.) If approved, $251,005.23 will be paid out to the participating plaintiffs at the $9.71 per hour distribution rate. (Ex. 2, Ellis Decl. ¶ 16); (Ex. 3, Kondras Aff. ¶ 14.) This reflects a realization of 65.8% of the maximum $381,711.19 allowed by the SETTLEMENT AGREEMENT. *See* (Ex. 1 at 4) (maximum gross settlement amount of $572,000.00 less $190,288.81 in attorneys' fees); (Ex. 2, Ellis Decl. ¶ 16); (Ex. 3, Kondras Aff. ¶ 14.)

### 2. The settlement distribution process is also fair and reasonable.

The Court should also approve of the settlement distribution process, which allows the participating plaintiffs to be paid without further action. Unlike in some collective action settlements, there will be no delay associated with gathering additional claim forms. Rather, participating plaintiffs will receive their payments within 21 business days of the "Final Effective Date," which is 21 days after the end of the 45-day opt in period. *Compare Gallant*, 2020 WL 2113399, at *2 (settlement checks to be mailed "within 30 days of the Settlement Agreement's Effective Date (that is, the later either 31 days following our Order Granting Approval of the Settlement if no appeal is taken, or the entry of a final order and judgment after any appeals are resolved.").

Each plaintiff will have 120 days to negotiate their settlement checks and procedures are provided for the Settlement Administrator to re-mail undelivered checks and replace lost or stolen checks. *Accord id.* (approving settlement agreement where collective members had 120 days to cash checks). If a settlement check is not cashed within 120 days, it will be remitted to THE TAP.

### 3. Collective Counsel's Attorneys' Fees, Costs, and Expenses are Fair and Reasonable

The Court should also award the PARTIES' agreed-upon attorneys' fees to COLLECTIVE COUNSEL. Pursuant to the SETTLEMENT AGREEMENT, COLLECTIVE COUNSEL is to be paid one-third of the settlement fund ($190,288.81) as attorneys' fees, in addition to reimbursement for reasonable out-of-pocket costs and expenses incurred in litigating and resolving this matter. (Ex. 2, Ellis Decl. ¶ 17); (Ex. 3, Kondras Aff. ¶ 15.) All other fees and expenses will be paid directly from the maximum gross settlement fund. For the reasons stated below, this request is fair and reasonable.

> a. *Analysis of the Market for Legal Services and Risk of Nonpayment Supports Collective Counsel's Request for Attorneys' Fees*

Attorneys' fees equal to one-third of the PARTIES' settlement are consistent with the market. In awarding fees, courts ultimately "must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the

market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 178 (7th Cir. 2001); *see, e.g., Gallant*, 2020 WL 2113399, at *4 (quoting *Campbell*, 2012 WL 1424417, at *2) (same). "District judges are allowed considerable discretion in deciding whether to apply the lodestar approach to attorney fee awards or the percentage approach." *Gallant*, 2020 WL 2113399, at *4 (citing *Flori v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994)). District courts "undertake an analysis of the terms to which the private plaintiffs and their attorneys would have contracted at the outset of the litigation when the risk of loss still existed." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). They "must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, [and] information from other cases." *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).

The attorneys' fees requested by Collective Counsel are based on the market in the Seventh Circuit and "is in line with terms regularly approved by this and other federal district courts in [this] circuit." *Gallant*, 2020 WL 2113399, at *4 (awarding one-third of settlement fund as attorneys' fees in FLSA collective action settlement); *see, e.g., Chen*, 2020 WL 360517, at *5 (same); *Campbell*, 2012 WL 1424417, at *2 (same); *Brewer v. Molina Healthcare, Inc.*, No. 1:16-CV-09523, 2018 WL 2966956, at *3 (N.D. Ill. June 12, 2018) (same); *Burkholder*, 750 F. Supp. 2d at 997 (same). As one court in this District observed, "lawyers practicing employment law in this region routinely contract for fees equaling one-third of the

overall recovery amount." *Chen*, 2020 WL 360517, at *5 (collecting cases); *see also Brewer*, 2018 WL 2966956, at *4.

In this case, the one-third allocation also represents a reduction from the percentage permitted by COLLECTIVE COUNSEL's initial agreement with the Inman. (Ex. 2., Ellis Decl. ¶ 13; (Ex. 3, Kondras Aff. ¶ 11.) *Accord Gallant*, 2020 WL 2113399, at *4 (reliance on terms established "at the outset of this litigation reinforces [] confidence in its fairness."); *In re Synthroid*, 325 F.3d at 976 (affirming district court's reliance on the agreement between counsel and client to determine the "market rate for [ ] legal services").This reduction, which brings the attorneys' fee terms in line with rates previously approved by courts in the Seventh Circuit, further reinforces that COLLECTIVE COUNSEL are requesting a reasonable market rate as it relates to the absent opt-in plaintiffs.

Finally, the "Seventh Circuit routinely acknowledges that counsel accept a risk of nonpayment when they embark on representation of a class of plaintiffs on a contingency fee basis." *Gallant*, 2020 WL 2113399, at *4 (citing *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) and *Koszyk*, 2016 WL 5109196, at *4 (N.D. Ill. Sept. 16, 2016)). It has recognized that a "significant degree of risk of nonpayment" is an appropriate factor in considering attorneys' fee awards. *Taubenfeld*, 415 F.3d at 600. Here, COLLECTIVE COUNSEL took on this collective action lawsuit on a contingent basis. COLLECTIVE COUNSEL not only invested their time, but also paid significant expenses up front, including filing fees, and

mediation fees and expenses. "As the Seventh Circuit has noted, [Collective] Counsel 'could have lost everything' they invested." *Koszyk*, 2016 WL 5109196, at *4 (quoting *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992)).

        *b.*    *Collective Counsel's expenses and costs are reasonable.*

The Court should also approve reimbursement to COLLECTIVE COUNSEL for their "reasonable out-of-pocket expenses incurred and customarily charged to their clients, [which] were incidental and necessary to the representation of those clients." *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). *See also, e.g., Gallant*, 2020 WL 2113399, at *4 (reimbursing costs "representing counsel's out-of-pocket costs and expenses incidental and necessary to litigating this matter, including coverage of pro hac vice admission fees, postage, mediator's fees, court fees, and research costs") (citations omitted); *Chen*, 2020 WL 360517, at *5 (same). The SETTLEMENT AGREEMENT provides for reimbursement of COLLECTIVE COUNSEL's litigation expenses and costs, which THE TAP agrees are reasonable and does not oppose. However, Collective Counsel's expenses, including mediation costs and filing fees, are only a few thousand dollars.

Here, the primary expense (about 80% of expenses) was Plaintiff's share of the costs of the November 7, 2022, mediation. Total costs and expenses are reasonable (approximately $5,000.00).

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should enter an order approving the PARTIES' SETTLEMENT AGREEMENT (Ex. 1), certifying this action as an FLSA collective action for the purposes of settlement, ordering a *Notice of Settlement* be mailed to potential collective members, issuing a release, and entering a final judgment. This requested resolution fairly and reasonably compensates all of the participating COLLECTIVE members for the minimum wages they allege to have been denied under the THE TAP's tip pooling and tip credit practices.